Filed 9/30/21  In re Gizelle D. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re Gizelle D. et al., Persons Coming Under the Juvenile Court Law. | B308580, consolidated with B309967 (Los Angeles County Super. Ct. No. 20CCJP01942A-D) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>Jermaine D. et al.,<br><br>        Defendants and Appellants. | ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN THE JUDGMENT |

THE COURT:

It is ordered that the opinion filed on September 9, 2021, be modified as follows:

1. On page 8, in the sentence commencing the first full paragraph, "argues" is replaced by "has argued," and the extraneous words "does not constitute substantial evidence of risk of sexual abuse" are omitted, so that the sentence reads:

> Second, mother has argued father's past sexual abuse *of Kierra* does not pose a risk of sexual abuse *to Kierra's younger siblings*.

\* \* \*

There is no change in the judgment.

Appellant N.D.'s petition for rehearing is denied.

_____

LUI, P.J.                    CHAVEZ, J.                    HOFFSTADT, J.

2

Filed 9/9/21  In re Gizelle D. CA2/2 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re Gizelle D. et al., Persons Coming Under the Juvenile Court Law. | B308580, consolidated with B309967 (Los Angeles County Super. Ct. No. 20CCJP01942A-D) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>Jermaine D. et al.,<br><br>        Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Jean M. Nelson, Judge.  Affirmed, but conditionally remanded.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant Nicole D.

Andre F.F. Toscano, under appointment by the Court of Appeal, for Defendant and Appellant Jermaine D.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey M. Blount, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

In this consolidated appeal, Jermaine D. (father) and Nicole D. (mother) together challenge the juvenile court's exertion of dependency jurisdiction over the three children they have together, its initial removal of those children from their custody, and its compliance with the Indian Child Welfare Act, or ICWA. (25 U.S.C. § 1901 et seq.)  We conclude that the juvenile court properly exerted jurisdiction over the children and that its removal order is moot as to two of the children but still proper as to all three, but that the court's ICWA findings are not supported by substantial evidence.  Accordingly, we affirm in part and remand with directions to comply with ICWA.

## FACTS AND PROCEDURAL BACKGROUND

### I.    Facts

Father and mother have three children together:  Gizelle (born January 2005), and twins Danielle and Denzel (born October 2006).  Mother has two older children with other men:

Kierra (November 2002) and an adult son Jonathan.

While "consider[ing] Jonathan and Kierra" to be "[his] children," father subjected each of them to sexual abuse for years on end.[1]  From when Kierra was age 10 to 17 (that is, between approximately 2012 and 2019), father forcefully kissed Kierra with his tongue; he touched, caressed, squeezed, and tried to suck her breasts nearly every day under the pretense that he was "touching them for breast cancer"; he regularly forced Kierra to grab his penis and masturbate him; he orally copulated her (sometimes starting while she was asleep); and he "dry humped" her (that is, he simulated vaginal sex while clothed).  During much of this time period (that is, between approximately 2008 and 2014), father also repeatedly molested Jonathan by making Jonathan watch pornography while simultaneously masturbating father; by making Jonathan orally copulate him; and, on one occasion, by attempting to anally penetrate Jonathan.

Over the years, both Kierra and Jonathan reported father's sexual abuse of them to mother—either directly to mother or indirectly to family relatives who then told mother.  When mother confronted father, he denied the abuse.  Thereafter, whenever Kierra, Jonathan, or any family member would report abuse, mother refused to believe them, choosing instead to believe that father was "a good dad" and "a great man of God" and that Kierra and Jonathan were "liars" who "d[id] drugs."

---

[1]     This was not father's first time sexually abusing children: When father was a minor, his younger sister reported that father would make her sit on his lap and rub her back and buttocks.

3

## II.    Procedural Background

### A.    *Petition*

On April 7, 2020, the Los Angeles Department of Children and Family Services (the Department) filed a petition asking the juvenile court to exercise dependency jurisdiction over Kierra, Gizelle, Danielle, and Denzel.  The petition alleged that jurisdiction was warranted due to (1) father's sexual abuse of Kierra, and (2) mother's "failure and unwillingness to protect" Kierra from that abuse, which placed all four children "at substantial risk of serious harm, damage, danger, sexual abuse, and failure to protect" (thus warranting jurisdiction under Welfare and Institutions Code section 300,[2] subdivisions (b), (d), and (j)).

### B.    *Exertion of jurisdiction and removal*

In late October 2000, the juvenile court sustained all of the allegations in the Department's petition and accordingly exerted dependency jurisdiction over Kierra, Gizelle, Danielle, and Denzel.  In so ruling, the court found Kierra and Jonathan to be credible regarding the abuse they suffered, and found that mother had failed to protect them by disbelieving their repeated reports of abuse—a finding further corroborated by mother's postpetition efforts in this case to convince Gizelle, Denzel, and Danielle that Kierra was a "liar" and to pressure Kierra to recant her reports of abuse.  The court further found "the nature of the sexual abuse . . . is so persistent and so pervasive and so aberrant that [Gizelle, Danielle, and Denzel] are at risk as well."

The court ordered all four children removed from mother and father.  Although father had been charged with committing

_____

[2]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

4

lewd and lascivious acts upon a minor (Pen. Code, § 288) and was at that time incarcerated pending trial, he had yet to be tried, convicted, or sentenced. The court rejected mother's argument that the children were no longer at risk because father was in pretrial detention, reasoning that father had yet to be convicted and could be released on bail pending trial due to the pandemic; mother's argument that father would "remain in prison for a long time," the court reasoned, was "speculation."

## C. *Appeals and Postappeal Developments*

Father and mother filed separate timely appeals from the jurisdictional and dispositional findings, and we consolidated their appeals.

On March 22, 2021, the Department filed a supplemental petition under section 387 as to the maternal aunt caregiver.[3] On June 30, 2021, the juvenile court sustained the supplemental petition as to all three children and ordered Danielle and Denzel released to the home of mother.[4]

## DISCUSSION

In her appeal, mother (joined by father) challenges the juvenile court's jurisdictional and removal orders as to the youngest three children (as Kierra turned 18 years old during the pendency of this appeal). In his appeal, father (joined by mother) challenges the juvenile court's compliance with ICWA.

---

[3] The record on appeal does not contain the petition nor do the parties make any reference to it.

[4] We requested supplemental briefing from the parties to ascertain Gizelle's placement and whether the issue of removal is now moot.

# I.    Jurisdictional Findings

The Department's petition in this case rested on three statutory grounds for exerting dependency jurisdiction—namely, subdivisions (b), (d) and (j) of section 300.  Subdivision (j) empowers a juvenile court to assert jurisdiction over a child when (1) his or her sibling has been abused or neglected, and (2) there is a substantial risk that the child will also be abused or neglected.  (§ 300, subd. (j); *In re I.J.* (2013) 56 Cal.4th 766, 774 (*I.J.*).)  "[I]n determining whether there is a substantial risk to the child" under subdivision (j), the juvenile court is to examine "the totality of the circumstances," including (1) "the circumstances surrounding the abuse or neglect of the sibling," (2) "the age and gender of each child," (3) "the nature of the abuse or neglect of the sibling," (4) "the mental condition of the parent," and (5) "any other factors the court considers probative."  (§ 300, subd. (j); *I.J.*, at pp. 774, 779.)  We review a juvenile court's findings exerting jurisdiction over a child for substantial evidence.  (*In re J.S.* (2021) 62 Cal.App.5th 678, 685.)

Substantial evidence supports the execution of dependency jurisdiction over Gizelle, Danielle, and Denzel under subdivision (j) of section 300.  Based on Kierra's statements that the juvenile court found to be credible, there is substantial evidence that Kierra—a sibling of Gizelle, Danielle, and Denzel—was abused, thus satisfying the first requirement of jurisdiction under subdivision (j).  There is also substantial evidence that Gizelle, Danielle and Denzel are at "substantial risk" of abuse or neglect, thus satisfying the second requirement under subdivision (j).  That is because a parent's """aberrant sexual behavior""" toward one child """places [the victim-child's] siblings who remain in the home at risk of [further] aberrant sexual abuse""" by that parent.

6

(*Los Angeles County Dept. of Children & Family Services. v. Superior Court* (2013) 215 Cal.App.4th 962, 969 (*A.C.*); accord, *I.J.*, *supra*, 56 Cal.4th at p. 778 [father's "serious and prolonged" sexual abuse of daughter supported finding of substantial risk as to all other children].)  Such conduct poses a risk to *all* siblings because it constitutes a "'fundamental betrayal of the appropriate relationship between the generations.'"  (*I.J.*, at p. 778; *In re Kieshia E.* (1993) 6 Cal.4th 68, 76-77 ["When a parent abuses his or her own child, . . . the parent also abandons and contravenes the parental role"].)  Father's sexual abuse of his stepdaughter Kierra constitutes "aberrant sexual behavior" and an abandonment of his parental role that places *all* the children in the household—including Gizelle, Danielle, and Denzel—at substantial risk of abuse and neglect.  As our Supreme Court noted in *I.J.*, the "very uncertainty" of whether a parent's sexual abuse of one child "is likely" to result in future sexual abuse of another child "makes it virtually incumbent upon the juvenile court to take jurisdiction over the [child's] siblings."  (*I.J.*, 56 Cal.4th at p. 779.)

Mother responds with two arguments.

First, she argues that father did not pose any risk to the children because, at the time of the jurisdictional hearing, he was incarcerated pending criminal charges for the sexual abuse of Kierra.  For support, she cites *In re Carlos T.* (2009) 174 Cal.App.4th 795 (*Carlos T.*).  *Carlos T.* all but dictates affirmance of the juvenile court's jurisdictional ruling in this case.  In that case, a sexually abusive father argued that his incarceration following conviction but prior to sentencing ameliorated any risk of sexual abuse to the children.  (*Id.* at p. 806.)  The court rejected this argument, explaining that there was sufficient risk of abuse

7

to the children based on "the possibility" that father could be "released from custody" if his conviction were reversed on appeal, in which case there was "every reason to believe father would resume his sexual abuse" and that "mother would not protect the children from abuse." (*Ibid.*) Here, father has yet to be convicted and still enjoys the presumption of innocence. If the possibility of release following reversal of a conviction on appeal in *Carlos T.* was sufficient evidence of substantial risk, the far greater possibility of acquittal that exists in the pretrial context of this case is certainly sufficient.

Second, mother argues father's past sexual abuse *of Kierra* does not pose a risk of sexual abuse does not constitute substantial evidence of risk of sexual abuse *to Kierra's younger siblings*. Mother is wrong. Father has demonstrated a penchant for sexually abusing children of both genders, and the fact that Gizelle, Danielle, and Denzel are his biological children (unlike Kierra and Jonathan) is of no consequence, especially where, as here, father has said he regarded Kierra and Jonathan as his own children. The case law "overwhelmingly hold[s] that sexual abuse of one child may constitute substantial evidence of a risk to another child in the household—even to a sibling of a different sex or age or to a half sibling" because, as noted above, molestation of *any* child may be "'so sexually aberrant'" that all children in the household are at risk of becoming victims of that behavior. (*A.C.*, *supra*, at p. 968; see also *In re I.J.*, *supra*, 56 Cal.4th at p. 778; *In re P.A.* (2006) 144 Cal.App.4th 1339, 1345-1347; *In re Karen R.* (2001) 95 Cal.App.4th 84, 90-91; *In re Ricky T.* (2013) 214 Cal.App.4th 515, 523; *In re Ana C.* (2012) 204 Cal.App.4th 1317, 1331.)

Because there is sufficient evidence to support jurisdiction under subdivision (j) of section 300, we need not consider the other two statutory grounds for jurisdiction. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451; *In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875-876.)

## II.   Removal

### A.   *Of Danielle and Denzel*

Because the juvenile court vacated its removal order as to Danielle and Denzel and has allowed them to live with mother, mother's challenge to the removal order as to those two children is now moot. (E.g., *In re Raymond G.* (1991) 230 Cal.App.3d 964, 967.) Given that father was incarcerated at the time the removal order was entered, he does not have a right to have the children in *his* personal custody beyond their return to mother's custody. (Accord, § 361, subd. (c)(5) [child is to be removed from custody of parent who is "incarcerated" absent arranging for others to care for child].) The parents resist this conclusion, asserting that if they succeed in challenging the removal order as to Danielle and Denzel, they will be entitled to a longer period of reunification services for those children (because the period used up during any erroneous removal would no longer count against the statutorily mandated maximum period). We need not resolve this point because the trial court did not err in removing those children, as we explain next.

### B.   *Of Gizelle*

As most pertinent here, a juvenile court may remove a child from his or her parent if (1) "[t]he [child] or a sibling of the [child] has been sexually abused . . . by a parent . . . or member of his or her household," and (2) "there are no reasonable means by which the [child] can be protected from further sexual abuse or a

9

substantial risk of sexual abuse without removing the [child] from his or her parent." (§ 361, subd. (c)(4).) We review the juvenile court's findings to ascertain whether substantial evidence supports the juvenile court's finding, by clear and convincing evidence, that removal was appropriate. (*In re V.L.* (2020) 54 Cal.App.5th 147, 155.)

Substantial evidence supports the juvenile court's finding by clear and convincing evidence that Kierra was sexually abused by father and that there are no "reasonable means" by which Gizelle (or her siblings) can be protected from the "substantial risk of sexual abuse" without removal. The jurisdictional finding that Kierra was sexually abused, that father poses a substantial risk of sexual abuse to her half-siblings notwithstanding his pretrial incarceration, and that mother failed to protect Kierra from father also constitutes evidence of risk that justifies removal of Gizelle (and her siblings) from mother. (See *In re T.V.* (2013) 217 Cal.App.4th 126, 135 ["The jurisdictional findings are prima facie evidence the minor cannot safely remain in the home"].) What is more, mother's conduct in not only disbelieving Kierra and demonstrating unbroken fealty to father, but also vilifying Kierra to her half-siblings and then engaging in a clandestine attempt to get Kierra to recant her statements only serves to exacerbate the risk of sexual abuse Gizelle (and her siblings) would face should father be released from pretrial custody or acquitted at trial.

Mother again responds with two arguments.

First, as above, she argues that father's pretrial incarceration eliminates all risk. We have already rejected that argument. In her reply brief, mother argues that the potential risk arising from father's potential release from pretrial custody

10

can be fully eliminated if the juvenile court, pursuant to its statutory authority under section 362, simply issues an order requiring father to stay away from the child should he be released.  We reject the argument that a stay away order, as a matter of law, eliminates all risk, particularly where, as here, substantial evidence supports the finding that mother is more concerned with her loyalty to father than protecting her children from father's sexual abuse.

Second, mother argues that removal is unwarranted because the Department did not make reasonable efforts to prevent or eliminate the need for removal and did not sufficiently document its reasonable efforts in its reports to the juvenile court.  Although mother is correct that the Department must make "reasonable efforts . . . to prevent or eliminate the need for removal" as a prerequisite for removal (§ 361, subds. (c)(1) & (e)); that the Department must in its report include "[a] discussion of the reasonable efforts made to prevent or eliminate removal" (Cal. Rules of Court, rule 5.690(a)(1)(B)(i)); and that the Department's reports in this case did not contain the necessary discussion, this omission is not prejudicial.  That is because substantial evidence supports the juvenile court's finding that the Department *did* undertake reasonable efforts to prevent removal—namely, mother's case plan included individual counseling, in-person sexual abuse awareness counseling, and conjoint family counseling with the children when deemed appropriate by the children's therapist, each of which, if heeded, would have avoided the need for removal.  "Reasonable efforts" are efforts that are "reasonable under the circumstances" and "based on the particular circumstances of a case."  (*In re H.E.* (2008) 169 Cal.App.4th 710, 725; *In re Amy M.* (1991) 232

11

Cal.App.3d 849, 856; *Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598-599.)  Although mother eventually provided the Department with proof of enrollment in internet-based programs that offered general information of prevention of sexual abuse of children, the juvenile court eventually found that *mother* had failed to make any progress with those programs because she continued to disbelieve Kierra's reports of sexual abuse and urged Kierra to recant.  Because the Department made reasonable efforts, its failure to catalogue those efforts and the juvenile court's explanation about why Gizelle (and her siblings) remained at risk leaves no reasonable probability that the court would come to a contrary conclusion had the Department included more information in its reports.  (E.g., *In re J.S.* (2011) 196 Cal.App.4th 1069, 1079; *In re Jason L.* (1990) 222 Cal.App.3d 1206, 1218.)

## III.   ICWA

Father (joined by mother) argues that the juvenile court erred in finding that the Department had complied with ICWA when, in fact, the Department violated ICWA's duties of further inquiry and notice.  We review the juvenile court's ICWA findings for substantial evidence.  (*In re J.S.* (2021) 62 Cal.App.5th 678, 688; *In re Charles W.* (2021) 66 Cal.App.5th 483, 490.)

### A.    *Pertinent facts*

Mother has never claimed any American Indian heritage.

Father has provided inconsistent information about any American Indian heritage.  Initially, father filled out the ICWA-020 form (1) indicating that "[o]ne or more of [his] parents, grandparents, or other lineal ancestors is or was a member of a federally recognized tribe," and (2) listing (a) the paternal grandfather (PGF), Willie J., as a member of the Blackfoot tribe,

and (b) the paternal grandmother (PGM), Etta G., as a member of the Cherokee tribe.  At his initial appearance, father indicated the same.  At a subsequent appearance, however, father disclaimed any Indian heritage.

After the initial appearance and before the subsequent appearance, the Department interviewed PGM; the Department could not interview PGF, as he was deceased.  PGM reported that *her* father (the paternal great grandfather (PGGF)) was Blackfoot and that *her* grandmother (the paternal great great grandmother (PGGGM)) was Cherokee, but stated that she did not have tribal enrollment information.  PGM supplied the names of some of her other ancestors, but no other information (aside from a few dates and places of death).

On the basis of this additional information, the Department in writing and through phone calls contacted the Blackfoot tribe, two of the three federally registered Cherokee tribes (that is, the Cherokee Nation and the Eastern Band of Cherokee Indians), the Bureau of Indian Affairs, and the Secretary of the Interior.  The Department made no effort to contact the third Cheroke tribe, but nevertheless informed the juvenile court that it had contacted *all* of the pertinent tribes.  On the basis of this information, the juvenile court found that it had no reason to know that any of the children was an Indian child within the meaning of ICWA.

**B.    *Analysis***

ICWA was enacted to curtail "the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement." (*Miss. Band of Choctaw Indians v. Holyfield* (1989) 490 U.S. 30, 32.)  Under the ICWA and California statutes our Legislature enacted to implement it (§§ 224-224.6), as recently amended, a juvenile

13

court—and, as its delegate, the Department—have duties all aimed at assessing whether a child in a pending dependency case is an "Indian child" entitled to the special protections of ICWA. (§ 224.2, added by Stats. 2018, ch. 833, § 5; § 224.3; *In re A.M.* (2020) 47 Cal.App.5th 303, 320 [applying ICWA law in effect at time of order appealed from].) For these purposes, an "'Indian child'" is a child who (1) is "a member of an Indian tribe," or (2) "is eligible for membership in an Indian tribe *and* is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4), italics added; § 224.1, subd. (a) [adopting federal law definition].) By its terms, this definition turns "'on the child's political affiliation with a federally recognized Indian Tribe,'" not "necessarily" "the child's race, ancestry or 'blood quantum.'" (*Austin J.* (2020) 47 Cal.App.5th 870, 882 (*Austin J.*), quoting 81 Fed.Reg. 38801-38802 (June 14, 2016).)

Under ICWA as amended, the Department and juvenile court have "three distinct duties." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052 (*D.S.*) [noting amendment's creation of three duties]; *Austin J.*, *supra*, 47 Cal.App.5th at pp. 883-884 [same].)

The first duty is the initial "duty" of the Department and the juvenile court "to inquire whether [a] child is an Indian child." (§ 224.2, subds. (a) & (b).) The Department discharges this duty chiefly by "asking" family members "whether the child is, or may be, an Indian child." (*Id.*, subd. (b).) For its part, the juvenile court is required, "[a]t the first appearance" in a dependency case, to "ask each participant present" "whether the participant knows or has reason to know that the child is an Indian child." (*Id.*, subd. (c).)

14

The second duty is the duty of the Department or the juvenile court to "make further inquiry regarding the possible Indian status of the child."  (*Id.*, subd. (e).)  This duty is triggered if the Department or court "has reason to believe that an Indian child is involved" (*ibid*), and, once triggered, obligates the Department to conduct further interviews to gather information, to contact the Bureau of Indian Affairs and state department of social services for assistance, and/or to contact relevant Indian tribe(s).  (*Id.*, subd. (e)(2); *In re D.F.* (2020) 55 Cal.App.5th 558, 566-567 (*D.F.*).)  As of September 18, 2020, the Department or court "has reason to believe that an Indian child is involved" if the Department or court "has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe," including information "indicat[ing]" but not "establish[ing]" the existence of any of the six circumstances satisfying the "reason to know" a child is an Indian child, detailed next.  (§ 224.2, subd. (e)(1), as amended by Stats. 2020, ch. 104, § 15.)

The third duty is the duty to notify the relevant Indian tribe(s).  (§ 224.3, subd. (a); 25 U.S.C. § 1912(a).)  This duty is triggered if the Department or the court "knows or has reason to know . . . that an Indian child is involved."  (§ 224.3, subd. (a).)  The Department or juvenile court has "reason to know a child involved in a proceeding is an Indian child" in one of six statutorily defined circumstances—namely, when (1) "[a] person having an interest in the child . . . informs the court that the child is an Indian child" (§ 224.2, subd. (d)(1)), (2) "[a]ny participant in the proceeding . . . informs the court that it has discovered information indicating that the child is an Indian child" (*id.*, subd. (d)(3)), (3) "[t]he child . . . gives the court reason

15

to know that the child is an Indian child" (*id.*, subd. (d)(4)), (4) the child or the parents reside, or are domiciled, "on a reservation or in an Alaskan Native village" (*id.*, subd. (d)(2)), (5) "the child is or has been a ward of a tribal court" (*id.*, subd. (d)(5)), or (6) "either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe" (*id.*, subd. (d)(6)).

Although the Department and the juvenile court discharged ICWA's initial duty of inquiry, they did not discharge the duty to make further inquiry under ICWA. Notwithstanding father's waffling on the issue of whether he had any American Indian ancestry, the investigative leads father initially provided prompted the Department to speak with PGM, who shared her belief that she may have Blackfoot and Cherokee heritage. Because PGM's information "suggest[ed] that either [father] or the child[ren] . . . may be eligible for membership in an Indian tribe," that information constituted a "reason to believe that an Indian child is involved" and hence triggered the Department's duty to inquire further by, among other things, contacting the Bureau of Indian Affairs and/or the relevant Indian tribe(s).[5] (§ 224.2, subd. (e)(2); *D.F.*, *supra*, 55 Cal.App.5th at p. 567.) The Department recognized as much by contacting the Bureau of Indian Affairs, the Secretary of the Interior, the Blackfoot tribe,

---

[5] Because this information did not give the Department or the juvenile court a reason *to know* the children were Indian children, they were not obligated to give formal notice to the pertinent tribes. As a result, the parents' arguments directed at the deficiency of *notice* are premature. Father's further argument that the Department responded only to the specific questions one tribe asked (rather than offering additional information) lacks merit for the same reason.

16

and two of the three Cherokee tribes to get their information. The Department fell short, however, because it did not contact the *third* Cherokee Tribe—that is, the United Keetoowah Band of Cherokee Indians in Oklahoma.  (86 Fed. Reg. 7554 (2021); https://www.doi.gov/tribes/cherokee [as of Sept. 1, 2021], archived at https://perma.cc/ZT45-R3GL.)  This omission means that the Department did not fully discharge its duty of further inquiry. Accordingly, we remand to allow the Department to fulfill its ICWA-mandated duty.  (*In re J.T.* (2007) 154 Cal.App.4th 986, 992-994.)

**DISPOSITION**

The juvenile court's order terminating parental rights is conditionally remanded, and the court is directed to properly comply with the requirements of the ICWA, which require proper notice to each of the three Cherokee tribes listed in the Federal Register. If, after proper inquiry and notice, the court finds that the children have native American ancestry, the court shall proceed in conformity with ICWA. Otherwise, the court's orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORT.

_____, J.

HOFFSTADT

We concur:

_____, P. J.

LUI

_____, J.

CHAVEZ